UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CALVIN SMITH, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 12 C 7622 |
| IMHOTEP CARTER, M.D., RICHARD SHUTE, M.D., ROYCE BROWN-REED, ANNA McBEE, MARCUS HARDY and DARYL EDWARDS, | ) Judge Rebecca R. Pallmeyer ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Calvin Smith, an inmate at Stateville Correctional Center, has filed suit *pro se* under 42 U.S.C. § 1983, alleging that he has received inadequate medical treatment in violation of the Eighth Amendment. Plaintiff alleges that Defendants Dr. Imhotep Carter and Dr. Shute[1] failed to provide adequate medical care for his recurring knee problems, and that Defendants Marcus Hardy, Darryl Edwards, Royce Brown-Reed, and Anna McBee, were deliberately indifferent to his knee problems when they ignored his grievances and attempts to seek medical care. All of the Defendants, except for Dr. Shute, have moved for summary judgment. Dr. Carter argues that there is no evidence that he ignored Smith's knee pain, or that his treatment departed from the standard of care. Defendants Hardy, Edwards, Brown-Reed, and McBee, similarly urge that there is no evidence that they were deliberately indifferent to Plaintiff's medical needs, because, as non-medical personnel, they were entitled to rely on the judgment of medical professionals. Even after full briefing, however, this court concludes there are

---

[1] "Dr. Shute," former Stateville Medical Director, is a named Defendant but, despite issuance of one summons (Nov. 7, 2012) and two alias summons (Apr. 17, 2013 and Oct. 30, 2013), has never been served. (*See* Order of Oct. 30, 2013 [63]; Minute Entry of Apr. 16, 2013 [41]; Opinion of Nov. 6, 2012 [4].)

significant gaps in the record, and therefore denies Defendants' motions [69, 74] without prejudice, and will recruit counsel to represent Plaintiff.

## **DISCUSSION**

Plaintiff Calvin Smith, an inmate at Stateville Correctional Center ("Stateville"), suffers from recurring knee pain. Defendant Carter, a medical doctor licensed in Illinois, worked for Wexford Health Sources, Inc. ("Wexford") as Medical Director at Stateville from July 25, 2011 to May 10, 2012. (Decl. of Dr. Imhotep Carter, Jan. 22, 2014, Ex. B to Statement of Material Facts in Supp. of Dr. Carter's Mot. for Summ. J. [70], hereinafter "Carter Decl.," ¶ 2.) The remaining Defendants, excluding Dr. Shute, all are, or were during relevant times, employed by Stateville: Royce Brown-Reed has been the Health Care Unit Administrator since May 2010; Anna McBee has been the Grievance Officer since July 2010; Marcus Hardy was Warden and Chief Administrative Officer between December 1, 2009 and December 2012; and Darryl Edwards was Assistant Warden of Programs between September 2010 and August 2012. (Rule 56.1 Statement of Defs. Hardy, Edwards, McBee & Brown-Reed 56.1 [77], hereinafter "Hardy's 56.1," ¶¶ 2–5.)

**I.    Plaintiff's Medical Care**

Plaintiff alleges that as early as 2007 he began complaining to prison officials of pain in his knee. (Pl.'s Local Rule 56.1 Statement in Supp. of the Denial of the Defs.' Summ. J. [84], hereinafter "Pl.'s 56.1," ¶ 3.) In October 2008, Plaintiff visited Physician's Assistant LaTonya Williams, complaining of right knee pain. (Carter Decl. ¶ 5; *see also* Offender Outpatient Progress Note, Oct. 3, 2008, Grp. Ex. B to Carter Decl., hereinafter "10/3/08 Notes.") Williams physically examined both of Plaintiff's knees, acknowledged that Plaintiff had right knee pain, and provided him with ice, a knee brace permit, a three-month prescription for Tylenol (500 mg), and analgesic balm. (*Id.*) Plaintiff also claims that Williams ordered an x-ray during this visit, though no such order appears in his medical record. (Pl.'s 56.1 ¶ 8; *but cf.* 10/3/08 Notes.) Williams saw Plaintiff again on August 7, 2009, complaining that the permit for his knee brace

2

had expired and the brace had been confiscated. (Carter Decl. ¶ 6; Offender Outpatient Progress Note, Aug. 1, 2009, Grp. Ex. C to Carter Decl.) Williams issued a one-year permit for the knee brace. (*Id.*) Two years later, on August 8, 2011, Plaintiff visited Williams again, reporting that he had pain in both knees and had fallen while jogging. (Carter Decl. ¶ 9; Offender Outpatient Progress Note, Aug. 8, 2011, Grp. Ex. E to Carter Decl., hereinafter "8/8/11 Notes.") Williams prescribed Motrin (400 mg), and instructed Plaintiff to apply heat and analgesic balm to both knees, to refrain from sports, the gym, and the yard, and to "lay-in" for two days. (*Id.*) In addition, Williams referred Plaintiff to the medical director for a knee evaluation. (8/8/11 Notes.) Plaintiff sought care on at least two other occasions between 2007 and August 2011 for other problems, and medical records for those visits make no mention of knee pain. (Carter Decl. ¶¶ 7–8; Offender Outpatient Progress Notes, Oct. 14, 2010, Ex. C to Carter Decl.; Offender Outpatient Progress Notes, Oct. 18, 2010, Ex. D to Carter Decl.)

On February 9, 2012, Plaintiff had his first appointment with Dr. Carter for knee pain. (Carter Decl. ¶ 10; Offender Outpatient Progress Note, Feb. 9, 2012, Ex. A to Carter Decl.) Dr. Carter evaluated both of Plaintiff's knees, noted there was no clinical evidence of tearing to either of Plaintiff's anterior cruciate ligaments, and concluded that Plaintiff likely suffered from degenerative joint disease. (*Id.*) Dr. Carter renewed Plaintiff's prescription for ibuprofen, instructed him to wear the knee brace on his left knee, and scheduled Plaintiff for a cortisone steroid injection in his left knee. (*Id.*) Following his initial visit with Dr. Carter, Plaintiff visited Dr. Carter on February 16 and March 1, 2012 to receive cortisone steroid injections in his left and right knees. (Carter Decl. ¶¶ 12–13; Offender Outpatient Progress Notes, Feb. 16, 2012, Grp. Ex. F to Carter Decl.; Offender Outpatient Progress Notes, Mar. 1, 2012, Grp. Ex. G to Carter Decl.) During these visits, Dr. Carter assessed Plaintiff with degenerative joint disease of the left knee, right knee pain, and tendonitis. (*Id.*) In addition to the cortisone shots, Dr. Carter examined Plaintiff's knees and again renewed his ibuprofen prescription. (*Id.*) When Plaintiff visited Dr. Carter once again on March 22, 2012 for left knee pain, Carter examined both of

Plaintiff's knees, assessed Plaintiff with bilateral knee tendonitis, and prescribed Ultram, a "centrally acting analgesic pain medication." (Carter Decl. ¶ 15; Offender Outpatient Progress Notes, Ex. H to Carter Decl.) Dr. Carter resigned as Stateville Medical Director on May 10, 2012. (Carter Decl. ¶ 16.)

None of Plaintiff's medical records, after his March 22, 2012 visit with Dr. Carter, are in the record. At his deposition, however, Plaintiff testified that he continued to visit the Health Care Unit ("HCU") for knee pain. On June 6, 2012, a "Code 3" emergency was called for Plaintiff after he collapsed in his cell and was unable to get up. (Calvin Smith Dep., Oct. 18, 2013, Ex. A to Carter's 56.1, 72:6–24; 73:22–74:15.) Dr. Shute placed Plaintiff on an emergency x-ray list and admitted Plaintiff to the HCU for overnight observation. (Smith Dep. 73:17–19; 75:1–9.) Plaintiff recalls that both knees were x-rayed, but he was not informed of the results. (*Id.* 77:11–18.) Attorney Todd R. Burgett, who took the deposition on behalf of Dr. Carter, suggested in his questioning that the x-ray results were "negative" (*see id.* 77:19–78:15)[2], but neither Plaintiff's June 6, 2012 medical record nor the x-ray results themselves are in the record.

---

[2] The exchange between Burgett and Smith, at Smith's deposition, proceeded as follows:

Q. If I told you that the results said that both knees were negative, what would that mean to you?

A. Well, due to the fact that a X-ray only shows bone damage or even little, slight calcium deposits, I can understand why it would say negative.

Q. Well, what does it mean to be negative?

A. It was no bone damage.

Q. So there were no — there was no damage to your bone, to the best of your ability? . . . .

Q. Your understanding was that there was no damage to your bones; correct?

A. Yes.

Q. On both of your knees; right? . . . .

Plaintiff filed this lawsuit on September 24, 2012.  On January 22, 2013, he visited Dr. Obaisi in the HCU, complaining of pain in both knees. (Smith Dep. 81:2–82:7.)  Though he had submitted "sick call letters" at least "[e]very two days," Plaintiff testified, he was seen by Dr. Obaisi only after he reported to Major McGarvey (or Johnson)[3] that he had not been given a medical appointment, and the Major arranged one for him. (*Id.* 82:3–83:17.)  Attorney Burgett's deposition questions suggest that Smith had an x-ray taken at this visit,[4] but Smith does not remember whether he had an x-ray and the medical records from this visit are not in the record. (*Id.* 85:13–24.)  In March 2013, Plaintiff visited Dr. Obaisi again complaining of knee pain. (*Id.* 86:5–12.)  Plaintiff testified that Dr. Obaisi injected a cortisone steroid in each of his knees, and prescribed two knee supports and the pain medication "Neurontin Gabapentin." (*Id.* 86:13–87:11; 87:17–19; 88:9–12.)  One month later, on April 16, 2013, Plaintiff visited Dr. Obaisi for knee pain, and reported that the cortisone steroid injections did not alleviate his pain. (*Id.* 88:13–18.)   Dr. Obaisi referred Plaintiff to the "collegial review board" in order to approve the consultation of an orthopedic specialist at the University of Illinois-Chicago. (*Id.* 88:19–89:14.)  According to Plaintiff, Dr. Obaisi told him that "there's nothing further that he can do for me and this should have been done years ago." (*Id.* 89:8–9.)  Finally, Plaintiff testified that he was prescribed with the pain medication Ultram on June 3, 2013 (by an unspecified doctor), but refused to take it because it hurt his stomach. (*Id.* 69:8–20.)

---

A.    Yes.

(Smith Dep. 77:19–78:15.)

[3]    Smith testified that he could not remember whether the major's last name was McGarvey or Johnson because she had recently changed her last name after getting married. (Smith Dep. 83:10–17.)

[4]    "Q. Even if there is one that was reflected in your records, would you dispute that an X-ray occurred on that day? A. No, I would not dispute. I would say it happened, it probably happened; but I do not recall it." (Smith Dep. 85:16–21.)

It appears that Plaintiff was approved for the orthopedic consult,[5] but when he arrived at UIC for his appointment (on an unspecified date), Plaintiff learned that Stateville staff had failed to send his medical files, including his x-ray results, to UIC. As a result, UIC personnel again x-rayed Plaintiff, and rescheduled his MRI. (*Id.* 89:20–90:9.) As of October 18, 2013, when Plaintiff was deposed, Plaintiff had not received an MRI. (*Id.* 90:7–9.) The record is devoid of any evidence of Plaintiff's medical care after June 2013.

## II. Plaintiff's Grievances

Plaintiff filed two emergency grievances with Stateville during this time. First, on October 2, 2011, Plaintiff filed an emergency grievance complaining about his knee pain and seeking additional medical treatment. (Offender's Grievance, Oct. 2, 2011, Ex. G to Hardy's 56.1, hereinafter "Oct. 2 Grievance.") In the grievance, Plaintiff summarized the medical treatment that he had received, but noted that the results of an x-ray taken in 2008 had not been reviewed by medical personnel and that he was still waiting for an appointment with the medical director. (*Id.* at 2–3.) Plaintiff complained that his knee pain has worsened: his right knee had started to "buckle and give out on me at least 1 to 2 times a day," and "wakes me up at night with my entire leg completely numb and . . . [I am] unable to move it." (*Id.* at 1.) His left knee also hurt. (*Id.* at 1–2.) Pain medication helped him sleep at night, Plaintiff asserted, but did not address his pain during the day. (*Id.* at 2.) Plaintiff asked "[t]o be examined by a competent orthropedic [*sic*] specialist outside of Stateville and also while in Stateville receive proper medical treatment . . . ." (*Id.* at 3.)

Warden Hardy denied the grievance on October 12, 2011 because the emergency was not substantiated, and instructed Plaintiff to re-file the grievance in the normal manner. (Oct. 2 Grievance at 1.) Plaintiff then appears to have re-filed the grievance, through a counselor. On

---

[5] At his deposition, when asked whether Dr. Obaisi had informed Plaintiff that he had been "approved for the consult," Plaintiff responded that he was never told that he had been approved "until they came to the unit and told me I had a writ" to go to the appointment for an MRI at UIC. (Smith Dep. 89:15–19.)

6

October 24, 2011, Counselor Sander responded that the grievance would be forwarded to the Grievance Office, and that Plaintiff should expect a response once the Grievance Office received a response from the HCU. (*Id.*; *see also* Hardy's 56.1 ¶ 12.) Plaintiff never received any response, however (Pl.'s 56.1 ¶ 7), and when she later examined Plaintiff's "Master File," Defendant McBee found that there was no record that the grievance had been sent to the Grievance Office. (Hardy's 56.1 ¶ 28.) Defendant Brown-Reed similarly claims that she did not review medical grievances before October 2012 and was "unaware" of Plaintiff's October 2 Grievance. (*Id.* ¶ 29.)

Plaintiff filed another emergency grievance on July 9, 2012. (Offender's Grievance, July 9, 2012, Ex. C to Compl. [1], hereinafter "July 9 Grievance.") In this filing, Plaintiff complained that HCU Administrator Brown-Reed never responded to his October 2 Grievance, even though Counselor Sander stated that this grievance would be forwarded to the Grievance Office. (July 9 Grievance at 2.) Neither Brown-Reed nor McBee responded to his letters, Plaintiff noted. (*Id.*) And, during this time, Plaintiff stated, his knee pain worsened. (*Id.*) Warden Hardy denied this grievance on July 31, 2012, indicating that the emergency was not substantiated. (*Id.* at 1.) Plaintiff did not re-file the grievance through the normal grievance process. (Smith Dep. 134:20–135:1.)

In addition to the written grievances, Plaintiff claims that he complained to Defendants Hardy, Edwards, and Brown-Reed informally. On July 7, 2012, while sitting in the HCU "bullpen," Plaintiff asked Brown-Reed about his October 2 Grievance, and Brown-Reed allegedly responded, "I'll get to it when I get to it." (Pl.'s Resp. to Hardy's 56.1 [86] ¶ 17.) Then, on July 14 and 15, 2012, during a "tactical shake down," Plaintiff claims that he told Hardy about his knee problems and the unanswered October 2 Grievance. (Pl.'s 56.1 ¶¶ 24–25) (citing Joseph Arrieta Aff., Ex. C to Pl.'s Resp. to Carter's Mot. for Summ. J. [87]; Don J. Rios Aff., Ex. I to Pl.'s Resp. to Carter's Mot.) In May 2012 and on July 14, 2012, Plaintiff alleges that he spoke with Edwards about the same issues, and in response, on July 14, Edwards assured Plaintiff

7

that a doctor would look into it. (Compl. [1] ¶ 17; Pl.'s 56.1 ¶ 26 (citing Arrieta Aff.; Rios Aff).) Brown-Reed denies speaking with inmates in the bullpen about medical care (Hardy's 56.1 ¶ 30), and neither Hardy nor Edwards recalls conversations with Plaintiff. (Hardy's 56.1 ¶¶ 23, 26.) In addition, Hardy and Edwards object to Plaintiff's reliance on the affidavits of inmates Joseph Arrieta and Don Rios,[6] arguing that because the affiants were not disclosed during discovery, Hardy and Edwards did not have the opportunity to depose them, and that the content of the affidavits is inadmissible hearsay. (Hardy's Resp. to Pl.'s 56.1 [89] ¶ 25.)

### III.     Gaps in the Record

Even after discovery and full briefing by Plaintiff and Defendants Carter, Hardy, Edwards, Brown-Reed, and McBee, there remain significant gaps in the record. Most notably, none of the records of the medical care that Plaintiff received at Stateville after May 2012 are in the record. Plaintiff offered his own testimony on that score—he recalled visiting the HCU on at least four occasions after May 2012—but the record is either incomplete or silent with respect to the tests that the medical professional(s) performed; the treatment, if any, that medical professional(s) provided; the medical professional(s)' assessment of Plaintiff's condition; or whether Plaintiff's contacts with the HCU for knee pain were limited to the four visits he testified about during his deposition. Significantly, though it appears that Plaintiff's knees were in fact x-rayed on several occasions during the relevant time, none of those x-ray records or results

---

[6] Both affiants observed Plaintiff speak with Hardy and Edwards about his knee pain on July 14 and/or July 15, 2012. (Arrieta Aff. ¶ 10; Rios Aff. ¶¶ 1–2.) Rios, Plaintiff's cell neighbor, specified in his affidavit that on July 14, 2012 "orange crush conducted a tactical shakedown" and he observed Plaintiff stop Hardy and complain to him about his knee pain. (Rios Aff. ¶ 1.) In response, Hardy appeared to write down Plaintiff's name and identification number and told Plaintiff that he would look into it. (*Id.*) That same day, Rios also observed Plaintiff stop Edwards to complain about his knee pain, and heard Edwards respond that a doctor would visit Plaintiff that day. (*Id.*) On July 15, 2012, during another tactical shakedown, Rios saw Plaintiff again stop Hardy, and though he did not hear what Plaintiff said, he heard Hardy respond by directing Plaintiff to "talk to Warden Edwards about it." (*Id.* ¶ 2.) In addition, Arrieta, Plaintiff's cellmate between fall 2009 and July 25, 2013, stated that he observed Plaintiff suffering from knee pain, place letters in the sick call box, and complain that the steroid injections did not ease his pain. (Arrieta Aff. ¶¶ 1–3, 5–7.)

appear in the record. Nor does the record explain why Dr. Obaisi decided to refer Plaintiff to a specialist in April 2013, or whether Plaintiff has even received the MRI or met with a specialist.

The only medical evidence that Plaintiff has offered in support of his claim is a U.S. Department of Health and Human Services publication titled *Questions and Answers about Knee Problems*, which discusses various types of knee conditions. (*See* U.S. DEP'T OF HEALTH & HUMAN SERVICES, QUESTIONS & ANSWERS ABOUT KNEE PROBLEMS (2006), Ex. B to Pl.'s Resp. to Carter's Mot.) This evidence may not be admissible at trial, Defendants argue, as Plaintiff provides no evidence that his medical providers reviewed these documents in evaluating and treating him, nor has he established that the HHS publication is something that a reasonable physician would rely on in forming an opinion. (Carter's Resp. to Pl.'s 56.1 [92] ¶¶ 13–14, 18–19; Hardy's Resp. to Pl.'s 56.1 ¶¶ 13–14, 18–19.) In order to establish that he was harmed by any delay in treatment, Defendant Carter contends, Plaintiff must provide the testimony of a medical expert. (Carter's Reply [91] at 11.)

Carter is correct that Plaintiff must offer admissible medical evidence to support his claim that the delay in treatment caused him harm, but he is not correct that such evidence can only be established by an expert. *See Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (holding that "medical records indicating that [the plaintiff] had a nasal fracture, that he could experience further bleeding, and that he may need to see a specialist" and that the plaintiff "later underwent painful nose surgery" was "verifying medical evidence"). Here, Plaintiff has not provided expert testimony that the delay caused him further harm, but the medical records after May 2012 are incomplete, and after June 2013, non-existent. In the absence of these records, Defendants have not shown that there are no disputes of fact concerning the impact of delays in Plaintiff's treatment. Medical records might furnish a basis for a finding concerning the delays, similar to the situation in *Grieveson*. In short, without a more complete record, the court is not inclined to grant summary judgment on Plaintiff's claim of deliberate indifference.

## **CONCLUSION**

Defendants' motions for summary judgment [69, 74] are denied without prejudice. The court will recruit counsel to represent Plaintiff for further proceedings in this matter. A status conference is set for July 1, 2014 at 9:00 a.m. The parties are encouraged to discuss settlement.

ENTER:

Dated: June 10, 2014

*[signature: Rebecca R. Pallmeyer]*
RI
United States District Judge